UNITED STATES OF AMERICA

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | DOCKET NO. 15-CR-00046 |
| | * | DOCKET NO. 18-CV-01072 |
| | * | |
| | * | |
| VERSUS | * | JUDGE WALTER |
| | * | |
| | * | |
| | * | |
| MAURICE ANTUAN SPEIGHTS | * | MAGISTRATE JUDGE KAY |

**UNITED STATES' RESPONSE TO DEFENDANT'S
MOTION TO VACATE, SET ASIDE, OR
CORRECT SENTENCE, PURSUANT TO 28 U.S.C. § 2255**

NOW INTO COURT, through the undersigned Assistant United States Attorney, comes the United States of America, who files this response in opposition to the defendant's motion to vacate, set aside, or correct sentence, under 28 U.S.C. § 2255.  The defendant raises one claim:  that trial counsel was ineffective in failing to investigate the case in various respects.  As the defendant cannot satisfy the *Strickland v. Washington* standard as to any of his particular assertions, his motion should be denied and dismissed with prejudice.

# I.

## THE CRIMINAL CONDUCT[1]

In October of 2013, Tiffany Scott was a first lieutenant in the U.S. Army stationed at Ft. Polk, a military base located in the Western District of Louisiana.[2]  Scott was a lesbian who had never had a sexual relationship with a man.  [Rec. Doc. 53, pp. 35, 57, 60, 67-68].

Among Scott's friends were Kiasha Hamilton, an enlisted soldier whom Scott knew before Hamilton had entered the Army; Maurice Speights, a civilian she had met in a nightclub; and Maquisha and Carlos Roman, Speight's sister and brother-in-law, respectively.  Scott, Speights, and the Romans often spent time together at the Romans' house eating, drinking, and socializing. Everyone who knew Scott, including Speights, knew she was gay.  In spite of the fact that he was a little older, Scott regarded Speights as her "little brother."  [Rec. Doc. 53, pp. 37-39, 57-61, 63].

On October 19, 2013, Scott returned to Ft. Polk from Tampa, Florida, where she had been visiting her girlfriend.  She arrived around 7:00 p.m. and went

_____

[1] This summary derives from the evidence admitted at the trial of this case.  References to the trial transcript utilize the record document number assigned by the electronic filing system.  As to all record documents, citations include the page numbers assigned by the electronic filing system, not the page numbers on the original documents.

[2] By the time of trial, Scott had been promoted to the rank of captain. [Rec. Doc. 53, pp. 57, 72].

straight to the Romans' house.  Speights was already there along with some other family members who were grilling food, drinking, and "hanging out."  During that time, Scott consumed approximately two shots of Hennessey, a dark-colored brand of liquor.  [Rec. Doc. 53, pp. 60-62].

After visiting with the Romans for a couple of hours, Scott and Speights left their house and went to Hamilton's house, a two-story, three-bedroom townhouse located on the Ft. Polk military base.   When Scott and Speights first arrived, Hamilton's two young children were there.   But because Hamilton's husband was deployed at the time, and because she knew that she, Scott, and Speights were going out and would likely return late, she took them across the street so they could spend the night at a babysitter's.  [Rec. Doc. 53, pp. 36-37, 41-42, 63-64].

While Scott and Speights waited for Hamilton to get ready to leave, the two visited with each other and consumed some more of the Hennessey they had brought with them.[3]  By the time the three of them left Hamilton's home, Scott, who had consumed approximately two more shots, was visibly affected by the alcohol.  [Rec. Doc. 53, pp. 42-43, 51, 64-65].

---

[3] Hamilton testified that the bottle was ¼ empty when Speights and Scott arrived at her house, and by the time they left, even more of it had been consumed.  [Rec. Doc. 53, pp. 51-52].

With Hamilton driving her four-door Silverado pickup truck, Scott, Speights, and Hamilton made the 10-minute trip to Wild Rides, a bar outside Ft. Polk that was popular with military personnel. When they first arrived, Speights realized he had not brought any money with him. So, Scott agreed to withdraw some extra cash from an ATM machine so he could get into the bar and buy himself a drink. [Rec. Doc. 53, pp. 45, 65].

When they entered the bar, the three of them split up; as Scott was an officer and Hamilton was an enlisted soldier, it would have been inappropriate for them to be seen fraternizing with each other. Hamilton was aware that Scott had continued to drink while she was at the bar, though she was unaware of how much she consumed. For her part, Scott recalled having one drink in the bar; she could not recall anything after that. [Rec. Doc. 53, pp. 43-44].

By the time the three left Wild Rides at around 2:00 a.m., Scott was drunk, so much so that she was off-balance and required assistance to get into Hamilton's truck. Hamilton and Speights put her in the backseat, and Hamilton drove to her house. Hamilton noticed that Scott had "passed out" in the backseat of the car, and that she was slumped over in the seat. Scott had no memory of leaving the bar, nor was she aware of the ride to Hamilton's house. [Rec. Doc. 53, pp. 44-45, 66].

When they arrived at Hamilton's house and someone opened the door of the truck and told her to get out, Scott regained consciousness for a few moments but passed out again.  Hamilton had to get her out of the truck and help her walk to the house, as she could not do so unaided.  [Rec. Doc. 53, pp. 45-46, 66].

When they reached the house, Hamilton and Speights sat Scott down at the bottom of the stairs.  Scott's speech was slurred, and she was unable to walk up the stairs to the bedroom.  So, Speights and Hamilton essentially dragged her up the stairs, with Speights carrying the upper portion of her body, and Hamilton lugging her feet.  In spite of all the jostling this entailed, Scott did not wake up during the trip upstairs, though she would later have a vague memory of being carried up there.  [Rec. Doc. 53, pp. 46-47].

When they reached the landing, Speights and Hamilton put Scott in the small twin bed in Hamilton's daughter's room, which was the closest room at the top of the stairs.  Hamilton and Speights did not undress Scott or even remove her shoes, leaving her fully clothed instead.  [Rec. Doc. 53, pp. 37, 46-47, 56; Gov. Exh. 2, 4].[4]

Hamilton got a fan and directed it towards Scott, and then told Speights he should sleep in her son's room down the hall.  Though Speights initially went into that room, he quickly returned, stating it was too hot in there, and he also needed

---

[4] The trial exhibits appear in Record Document 35-2.

a fan.  As Hamilton had only one fan, she suggested Speights sleep on the floor in the same room as Scott.  Speights agreed to do so, and Hamilton went into her own bedroom and went to sleep.  [Rec. Doc. 53, pp. 47-48].

Sometime during the night, Scott partially awoke.  In what she would later characterize as "dream" state, she perceived that Speights was on top of her.  She heard him say, "I got this," and she blacked out again.  She had no further memory of the event.  However, under no circumstances would Scott, a lesbian, have consented to sexual intercourse with Speights.  [Rec. Doc. 53, pp. 67, 75, 84].

The next morning, Scott awoke and discovered that Speights was with her in the small twin bed, her pants were unbuttoned and her zipper was down, and she "didn't feel right."  As Scott lay in bed trying to "put it all together," Hamilton entered the bedroom.  Hamilton began telling Scott how drunk she had been the night before and asking her if she remembered certain aspects of the evening; Scott told her she did not.  [Rec. Doc. 53, pp. 55, 67].

When Scott used the bathroom, she noted there was blood on the toilet tissue when she wiped herself, and that her vaginal area was sore.[5]  When she went back to the bedroom, she tried to keep herself calm, though she was embarrassed about what had happened and did not want Hamilton to know about

---

[5] Scott had never had sexual intercourse with a man before.  [Rec. Doc. 53, pp. 67-68].

it yet.  She told Hamilton that she and Speights needed to leave.  [Rec. Doc. 53, pp. 67-68, 84].

When Hamilton left to retrieve her children from the babysitter's house, Scott and Speights left also.  Inside Scott's car, Scott, livid about what had happened the previous night, began cursing at Speights, repeatedly asking him what he had done to her, and if he had used "protection."  Scott cried during this exchange, as she felt angry and hurt by what Speights had done.  In response, Speights kept insisting that he could not remember what had happened between the two of them.  He also repeatedly asked Scott if she would forgive him, and if she intended to tell "Los," his nickname for his brother-in-law, Carlos Roman, what had happened.  Scott told him she was going to tell "everyone."  When they arrived at Speights' house, Scott told him to get out of her car and called him a "coward."  [Rec. Doc. 53, pp. 68-69].

Later that day, Scott, still upset, called Hamilton.  She told her about the blood she had observed when she used the bathroom, that her body felt "weird," and that she felt "violated" because her pants were unbuttoned when she woke up.  Scott asked for Hamilton's help in piecing together the events of the previous night.  She, however, did not tell Hamilton about anything Speights had said when she had confronted him in her car earlier that day.  [Rec. Doc. 53, pp. 53-56].

Scott assumed that Speights had told a false version of the night's events to his brother-in-law, Carlos Roman, because later that day, Roman and his wife called her.  When they heard her crying on the telephone, they came over to see her.  They offered to take her to the hospital and suggested she clean herself up by taking a shower, which she did.  [Rec. Doc. 53, p. 69].

Sometime after that, Scott called her girlfriend in Florida and told her what had happened.  Scott's girlfriend contacted a friend who was a sexual harassment liaison representative; that representative in turn contacted Scott's representative.  Scott's representative picked her up at her house and brought her to the hospital for an examination.  [Rec. Doc. 53, pp. 69-70].

Scott was examined at Bayne-Jones Army Hospital on the base by Maj. Veronica Dean, a registered nurse who had received special training in performing so-called "SAFE" examinations on victims of alleged sexual assaults.[6] Dean observed that Scott's appearance was clean, but that her eyes were red as if she had been crying.  Dean also observed that Scott appeared to be afraid and anxious.  [Rec. Doc. 53, pp. 76-78, 80-83].

---

[6] "SAFE" is the acronym for "Sexual Assault Forensic Examination."  Those examinations are intended to provide victims of sexual assault with medical and supportive care, and to collect evidence.  [Rec. Doc. 53, pp. 78].

When Dean asked Scott what had happened, Scott recounted the events as she remembered them, and Dean recorded them in her report.  When questioned by Dean, Scott indicated she was sure there had been penile penetration of her vagina; she was unsure whether her vagina had been digitally penetrated, or penetrated by a foreign object.  She was sure there had been no anal or oral sex. [Rec. Doc. 53, pp. 92-93].

After taking down that information, Dean conducted a physical examination of Scott's external genitalia using a black light, which would cause bodily fluids like semen or blood to fluoresce.   Dean did not detect the presence of those kinds of fluids.   Dean noted, however, that the fact that Scott had showered could have affected whether those could be detected.  Dean also visually inspected Scott's external genital area and tested her clothing, though it was not the same clothing she had worn during the sexual assault.  Though Dean did not observe any injuries with her naked eye, Scott could have sustained microscopic tears that Dean could only see with magnification, and Scott would not consent to the use of a colposcope or a camera, all of which are invasive to the examinee.[7] Later laboratory analysis of samples collected from Scott that day revealed no DNA but her own.  [Rec. Doc. 53, pp. 94-95, 98, 99].

_____

[7] A colposcope is a magnifying device used in vaginal examinations that would allow an examiner to see microscopic tears.  [Rec. Doc. 53, p. 95].

At the conclusion of the examination, Scott opted to make the report "restricted," meaning her report of the sexual assault would not be shared with law enforcement.[8]  She did this because she was embarrassed by what had happened and did not want her chain of command to know about it.  [Rec. Doc. 53, pp. 18-20, 70, 79, 89].

Approximately two months later, after receiving some counseling, Scott reconsidered and decided to report the sexual assault committed against her by Speights.  On December 10, 2013, she reported it to the Army's Criminal Investigation Division ("CID"), at which time investigators were granted access to the report of her SAFE examination.  Next, a CID investigator interviewed witnesses and verified the crime scene by visiting Hamilton's residence on Ft. Polk.  Finally, the CID investigator attempted to locate Speights but was unsuccessful in doing so because he had moved from the area.  So, the investigator requested the assistance of the FBI; thereafter, that agency assumed responsibility for the investigation.  [Rec. Doc. 53, pp. 21, 23, 71].

On March 18, 2014, FBI Special Agent Daniel McNair, then working in Tallahassee, Florida, located and interviewed Speights in connection with the investigation.  The non-custodial interview took place in an automobile in the

---

[8] The option to make a report "restricted" applies only to cases involving sex offenses. [Rec. Doc. 53, pp. 28-29].

parking lot of a local restaurant, a location requested by Speights.  In the course of the interview, Speights claimed that on the night of the alleged assault, he went with his sister and brother-in-law (i.e., the Romans), to a bar to play pool and meet some friends.  According to Speights, he saw Scott at the bar, and they interacted briefly.  He claimed he consumed only one beer that night, as he had a migraine headache, and he denied buying any drinks for Scott or being aware of how much alcohol she had consumed.  [Rec. Doc. 53, pp. 102-04].

Speights further asserted that he had left the bar with Scott and a friend of hers whose name he could not recall; that the friend had driven them to her apartment and left them there alone; that after about 25 minutes together in the living room, they had proceeded upstairs to a bedroom; that Scott had initiated consensual sexual contact between them by reaching into his pants and exposing his penis; and that he had partially undressed her and engaged in a brief, incomplete act of vaginal intercourse.  He stated that he had terminated the act because it "didn't feel right" since she was a lesbian.  Speights did not admit that he had met up with Scott before they went to the bar; that they had traveled to the bar together; that Scott was so drunk when they got to Hamilton's house that she had to be carried upstairs; that Hamilton was there in the house with them; and that he had apologized to Scott the next morning.  [Rec. Doc. 53, pp. 103-06].

## II.

## RELEVANT PROCEDURAL HISTORY

On March 12, 2015, Speights was charged in a one-count Bill of Indictment with sexual abuse within the special territorial jurisdiction of the United States, in violation of 18 U.S.C. § 2242(2) (Count 1).  [Rec. Doc. 1].   Ms. Cristie Gibbens, an Assistant Federal Public Defender, was appointed to represent Speights.  [Rec. Doc. 14].

The case proceeded to trial before a jury on September 19, 2016.[9]   The United States called the following witnesses:  Tiffany Scott, the victim; Lucas Pitre, the Army's CID investigator; Kiasha Hamilton, a witness to most of the events underlying the charged offense except the act of sexual intercourse itself; Veronica Dean, the nurse who performed the SAFE examination of Scott after Scott reported the assault; and Special Agent Daniel McNair, the FBI agent who interviewed Speights as part of the investigation.  [Rec. Doc. 53, pp. 102-03].  At the end of the first day of trial, the United States rested its case-in-chief, and the defendant moved for a judgment of acquittal; the district court denied the motion.  [Rec. Doc. 34].

---

[9] At the defendant's request, the trial was originally set outside the limits of the Speedy Trial Act, in part, to allow counsel time to interview potential out of state witnesses.  [Rec. Doc. 18].   Defense counsel later moved to continue that date, without objection from the United States, because the defendant was still awaiting the receipt of "scientific testing results from the evidence taken during Sexual Assault Forensic Examination Report (SAFE Report), including DNA evidence and toxicology results."  [Rec. Doc. 21].

On the second day of trial, the defendant rested without presenting any evidence.  [Rec. Doc. 39].  Later that day, the jury convicted Speights on the sole count of the Indictment.  [Rec. Doc. 39].  On January 12, 2017, Speights was sentenced to 121 months' imprisonment, to be followed by five years' supervised release.  [Rec. Doc. 48, 49].

On January 23, 2017, Speights filed a notice of appeal.  [Rec. Doc. 52].  On February 9, 2018, the Fifth Circuit affirmed his conviction, finding sufficient evidence "that Speights knew Scott was physically incapable of declining participation in the sexual act Speights committed," including "[a]mple testimony indicat[ing] that Speights knew that Scott was intoxicated to the point of unconsciousness."  *United States v. Speights*, 712 F. App'x 423, 426 (5th Cir. 2018).   The Fifth Circuit also affirmed the district court's sentencing determinations.  *Id.* at 427-28.

On August 20, 2018, Speights timely filed the instant *pro se* § 2255 motion, which was accompanied by his personal affidavit.  [Rec. Doc. 59].  The next day, this Court ordered the United States to file the instant response.  [Rec. Doc. 60].

## II.

## LAW AND ARGUMENT

In his § 2255 motion and accompanying affidavit, Speights raises one claim, in which he asserts he received constitutionally ineffective assistance of counsel

in connection with Ms. Gibbens' pre-trial investigation of the facts of his case. [Rec. Doc. 59, p. 4]. Liberally construed, Speights' motion claims counsel was focused exclusively on convincing him to plead guilty, and thus she did not pursue the following avenues of investigation:[10]

- Taking a statement from the eyewitness, Hamilton, regarding why she would leave a supposedly drunk female friend alone in her apartment with a man she (Hamilton) did not know [Rec. Doc. 59, p. 17];

- Obtaining a video of the parking lot of the nightclub where he and Scott spent time together earlier on the night of the incident, which might have revealed whether Scott was, in fact, heavily intoxicated [Rec. Doc. 59, p. 17];

- Taking statements from bartenders and servers at the club, and/or calling those individuals as witnesses at trial, also in order to show that Scott was not, as she claimed, highly intoxicated that night; and

---

[10] Some of Speights' complaints appear to be more akin to arguments on the sufficiency of the evidence than complaints about counsel's performance. For example, he notes that because Scott did not submit to certain invasive examination techniques, "how could there be proof [they] even had sex in the first place much less than she was passed-out drunk." [Rec. Doc. 59, p. 17]. As defense counsel could not have possibly controlled what kind of examination was done immediately after the sexual assault, a year and a half before Speights was even charged, the United States does not regard that allegation as a complaint against counsel's representation.

- Attempting to determine, based on the results of the SAFE examination, what Scott's blood/alcohol level was on the night of the alleged sexual assault.

[Rec. Doc. 59, p. 17].

Speights asserts that in light of these failures, defense counsel failed to advise him of "his right to present available witnesses," and that she "breached her duty to ensure Mr. Speights' decision to forego entering a plea and proceed to trial was an informed decision."  He further asserts these failures caused counsel "not to offer an affirmative defense or provide [him] with an informed legal opinion for his own consideration."   [Rec. Doc. 59, p. 13].   He requests an evidentiary hearing so he can establish he is "actually innocen[t]" of the sexual assault charge for which he was convicted.  [Rec. Doc. 59, p. 12].

Speights is not entitled to relief on his ineffective assistance of counsel claim, as he cannot satisfy either or both prongs of the *Strickland v. Washington* standard as to any of his particular complaints.   And as his claim may be dismissed on the existing record, he is not entitled to an evidentiary hearing.

### A.    AS SPEIGHTS CANNOT ESTABLISH BOTH DEFICIENT PERFORMANCE AND PREJUDICE FROM COUNSEL'S ALLEGED FAILURES, HE IS NOT ENTITLED TO COLLATERAL RELIEF ON HIS INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM.

Ineffective assistance of counsel claims are governed by the framework set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  In order to prevail on an

ineffective assistance of counsel claim under the *Strickland* standard, a petitioner must show (1) counsel's performance was deficient, in that it fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced him.   *Id.* at 687.  This Court need not address the two *Strickland* prongs in any particular order, and the defendant's failure to satisfy one means the court need not consider the other.  *Id.*

In establishing deficient performance, the defendant must demonstrate that counsel's "acts or omissions were outside the wide range of professionally competent assistance," *Id.* at 690.  "Given the almost infinite variety of possible trial techniques and tactics available to counsel, [the reviewing court] is careful not to second guess legitimate strategic choices." *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993) In short, "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney."  *Harrington v. Richter*, 562 U.S. 86, 110 (2011).

With regard to the prejudice prong, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

### 1.    *Failing to investigate certain defenses or subpoena certain witnesses*

In his motion, Speights complains that defense counsel, intent on convincing him to plead guilty instead of proceeding to trial, failed to investigate certain facts, or subpoena certain witnesses, in his defense.  Specifically, he contends counsel should have obtained copies of  surveillance videos from the nightclub where he and Scott spent time together on the night of alleged assault; that counsel should have called employees of the nightclub to testify at trial that Scott was not intoxicated; that counsel should have attempted to determine from the SAFE examination what Scott's blood/alcohol level was that night; and that counsel should have obtained a statement from Hamilton regarding why she would have left an intoxicated Scott alone with him.  As Speights admits in the affidavit attached to his § 2255 motion that he and Scott engaged in sexual intercourse that evening [Rec. Doc. 59, p. 15], he apparently believes these avenues of investigation would have established that Scott was not, as she claimed, too intoxicated to refuse consent.  [Rec. Doc. 59, p. 16].

First, as to the nightclub surveillance video and the testimony of the nightclub employees, even assuming for purposes of argument only that counsel did not attempt to obtain that evidence and should have, Speights cannot show prejudice, because he has not demonstrated that the video even existed, that the alleged witnesses would have testified, that their testimony would have been

favorable, or that any of their testimony would have changed the outcome of his case. *See Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (recognizing that to prevail on an ineffective assistance claim based upon uncalled witnesses, "an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable," and to prevail on a claim that counsel should have conducted further investigation, the defendant "must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial").

Although Speights is confident that "in today's world, there had to be video of the parking lot that would prove [Scott] was not drunk in any manner," [Rec. Doc. 59, p. 16], that is pure speculation. Other than that bald assertion, he offers no proof that the club actually used video surveillance; that, by the time counsel could have sought a copy of any video (a year and a half after that night), the nightclub would have still maintained it, as opposed to deleting it or recycling it[11]; that any surveillance cameras were located in a position that could have actually captured Scott's behavior that evening; or, most importantly, that anything a video might have revealed would overcome, in the eyes of the jury,

---

[11] The assault took place on October 19, 2013. Speights was not indicted until March 12, 2015. Even assuming counsel had sought the video evidence immediately after indictment, it would have been 18 months after the night at issue.

Scott's and Hamilton's consistent accounts of the events of that evening.  *See e.g.,*
*Green v. Lynaugh*, 868 F.2d 176, 177–78 (5th Cir. 1989) (in a case in which the
defendant claimed counsel was ineffective in failing to obtain certain records or
interview the state's witnesses, reversing the district court's grant of habeas
relief; even assuming counsel was ineffective in the way he prepared for trial,
"Green's burden was to demonstrate a possibility 'sufficient to undermine
confidence in the outcome' of his trial," and the district court's "speculation" that
a jury might have deadlocked if it had heard the missing evidence was
insufficient to satisfy that standard).

As to the potential testimony of bartenders, servers, or other employees of
the nightclub, Speights' claims they might have also testified that Scott was not
drunk that night are also purely speculative, particularly since he failed to attach
the supporting affidavits of any such individuals to his motion.  *Boyd v. Estelle*,
661 F.2d 388, 390 (5th Cir. 1981) (observing that complaints about uncalled
witnesses are not favored "because allegations of what a witness would have
testified are largely speculative") (citation omitted).

It is more likely, even assuming counsel could have located bartenders and
servers 18 months after an event, that none of them would have specific
recollection of that evening, or that none of them would have observed anything
favorable to the defendant.  *See United States v. Fields*, 761 F.3d 443, 461 (5th

Cir. 2014) (rejecting Fields' claim that he was prejudiced by counsel's failure to interview and call witnesses who were "potential eyewitness[es]" to a murder, or who could "corroborate [his] defense" that someone else was the killer; Fields' claims about those witnesses' potential testimony were "largely speculative" and lacking "specificity," and he failed to demonstrate how that testimony would have changed the outcome of his trial); *see also, Cox v. Stephens*, 602 F. App'x 141, 146 (5th Cir. 2015) (rejecting the defendant's ineffective assistance of counsel claim based on a failure to investigate and call witnesses that might have supported his theory of self-defense; "Cox has failed, through affidavits or otherwise, to demonstrate that these witnesses would have testified; identify the content of their testimony; or support that their testimony would have been favorable."). Speights cannot demonstrate prejudice from any failure on counsel's part to seek out surveillance video or subpoena unidentified nightclub employees to testify at trial.

Next, Speights' complaints about counsel's failure to determine, from the SAFE examination, the defendant's blood/alcohol level on the night in question fails under the first prong of *Strickland*, the deficient performance prong, as that examination likely would not have revealed that information.  According to the trial testimony, the events leading up to the sexual assault, including Scott's consumption of alcohol, reportedly occurred on the evening of October 19, 2013.

[Rec. Doc. 53, p. 18].  Scott did not realize she had been sexually assaulted until she awoke the next morning in bed with her pants unzipped, noticed blood on the toilet tissue when she used the bathroom, and noticed her vagina was sore.  [Rec. Doc. 53, pp. 55, 67-68, 84].  Embarrassed and upset, she left Hamilton's house and did not go to the hospital for the SAFE exam until much later that day.  [Rec. Doc. 53, pp.69-70].

According to the report prepared by Maj. Veronica Dean, the Army hospital nurse who performed the SAFE examination, Scott did not arrive at the hospital until "1715," that is, 5:15 p.m.  [Rec. Doc. 53, p. 81; Gov. Exh. 1].[12]  By that time, Scott's body would have certainly metabolized the alcohol she had consumed almost 24 hours earlier, and so that examination could not have revealed anything about her blood/alcohol level the night before.[13]  Counsel is not ineffective for failing to pursue futile investigative leads.  *See Ward v. Whitley*, 21 F.3d 1355, 1362 (5th Cir. 1994) (rejecting the defendant's claim that counsel was ineffective in failing to interview employees of a particular store where the defendant had bought alcohol prior to committing a murder; counsel believed

---

[12] Because Government Exhibit 1 contains sensitive medical information, it is in the sealed portion of the record.

[13] *See Alcohol Alert*, NAT'L INST. ON ALCOHOL ABUSE & ALCOHOLISM (showing that after eight hours, an adult fasting male had metabolized 100% of the alcohol in four rapidly-consumed drinks), available at http://pubs.niaaa.nih.gov/publications/aa35.htm (link operational as of November 2, 2018).

such efforts would be futile, as the defendant had told him he had not seen anyone at the store he knew, and as he had found those store employees uncooperative in the past).

But regardless of futility, the record suggests that defense counsel did make efforts to confirm whether the SAFE exam report would show whether Scott was, in fact, intoxicated.  As noted above, defense counsel moved to continue the first trial fixing, without objection from the United States, because the defendant was still awaiting the receipt of "scientific testing results from the evidence taken during Sexual Assault Forensic Examination Report (SAFE Report), including DNA evidence and toxicology results."  [Rec. Doc. 21].  As both the SAFE examination report and Maj. Dean's trial testimony confirm that no toxicology sample was taken during the exam, there were no such results to use at trial.[14]  [Rec. Doc. 53, pp. 96-97; Gov. Exh. 1, p. 12].  Speights has failed to show deficient performance in connection with the SAFE examination.

Finally, there is no merit to Speights' claim that counsel was ineffective because she failed to take the statement of Hamilton regarding why she would allow a highly intoxicated female friend to remain alone in her apartment with a

---

[14] The SAFE examination report includes a section titled, "Evidence Collected."  Maj. Dean checked the box on that page indicating that no toxicology sample had been collected, though the report reflects other swabs and samples were collected.  [Gov. Exh. 1, p. 13].

man she (Hamilton) did not know well.  First, Speights fails to identify the purpose such a "statement" would have served.  As hearsay, an interview statement from Hamilton would be inadmissible at trial for the truth of the matter asserted.

Its only possible use might have been to undermine Hamilton's assertions that Scott was extremely intoxicated by the time they arrived at Hamilton's apartment.  But any probative value would be minimal at best, because while Hamilton might not have known Speights well or trusted him, *Scott did*.  Scott testified that she was friends with Maquisha and Carlos Roman, Speights' sister and brother-in-law, and in spite of the fact that Speights was a little older than she, Scott regarded Speights as her "little brother."  [Rec. Doc. 53, pp. 37-39, 57-61, 63].

Hamilton testified at trial and could have been asked by defense counsel on cross examination why she felt safe leaving Scott with Speights even in a highly intoxicated state.  *Fields*, 761 F.3d at 461 (in rejecting the defendant's claim that counsel was ineffective in failing to interview and subpoena a certain witness who Fields asserted had assisted the actual murderer in committing the crime, noting that the witness "testified at trial, thereby providing Fields with an opportunity to cross-examine him about his alleged role in [the victim's] murder").  Defense counsel's decision not to do so was likely a strategic one aimed

at not eliciting further testimony that Speights had abused Scott's trust by assaulting her when she was too drunk to resist.  It is well-settled that the *Strickland* standard does not permit second-guessing of plausible strategic choices by defense defense counsel.  *See Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000) ("We must be particularly wary of arguments that essentially come down to a matter of degrees.  Did counsel investigate enough?  Did counsel present enough mitigating evidence?  Those questions are even less susceptible to judicial second-guessing.").

At bottom, though Speights contends defense counsel's ineffective investigation of his case deprived him of the opportunity to consider and present a viable defense, he has failed to show that counsel was deficient in failing to investigate those avenues, and/or how the undiscovered evidence would have changed the outcome of the trial.  He has failed to show a "substantial," rather than just a "conceivable" likelihood of a different outcome, so he is not entitled to relief.  *Harrington*, 562 U.S. at 112.

## 2. *Denial of the right to make an informed decision regarding whether to plead guilty rather than proceed to trial*

In his "Statement of Supporting Facts" attached to his § 2255 motion, Speights asserts that counsel's alleged deficient performance, in addition to depriving him of a defense at trial, also deprived him of the opportunity to make an "informed decision" regarding whether to plead guilty rather than go to trial.

[Rec. Doc. 59, p. 13].   In light of the record in this case, any suggestion that Speights would have pleaded guilty is specious.

In establishing prejudice in the connection with the decision to proceed to trial rather than plead guilty, the defendant must show that he would have accepted a plea offer; that the court would have accepted its terms; and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.  *Lafler v. Cooper*, 566 U.S. 156, 163-64 (2012).   On this record, Speights cannot clear the first hurdle, because nothing in the record remotely suggests he ever would have admitted committing any sort of sexual assault on Scott, an admission that would have been required for a guilty plea.  Speights' version of events has always been that while he and Scott did engage in a sexual act, it was entirely consensual. That is the story he told the FBI agent who interviewed him, [Rec. Doc. 53, p. 104]; that was the position he took during the pre-sentence investigation by declining to accept responsibility for the offense, [PSR at ¶ 14]; and, most importantly, that is the position he continues to take in his § 2255 motion, where he asserts, under oath, his "actual innocence," [Rec. Doc. 59, pp. 12, 15, 17]. The record does not support any credible claim that he would have ever considered a guilty plea.  Speights cannot show prejudice in connection with his decision, based on counsel's investigation of his case, to go to trial rather than plead guilty.

# III.

# CONCLUSION

Speights' allegations do not "undermine confidence in the outcome" of his trial, so he is not entitled to relief.  *Strickland*, 466 U.S. at 694.  And because "the motion and the files and records of the case conclusively show that [Speights] is entitled to no relief," *United States v. Rivas-Lopez*, 678 F.3d 353, 358 (5th Cir. 2012) (quotation marks and citation omitted), his § 2255 motion should be denied as to all claims without an evidentiary hearing and dismissed with prejudice.

Respectfully submitted:

DAVID C. JOSEPH
United States Attorney

BY:   *s/ Camille A. Domingue*

CAMILLE A. DOMINGUE (#20168)
Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, LA 70501
(337) 262-6618

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing United States' Response to Defendant's Motion to Vacate, Set Aside, or Correct Sentence, pursuant to 28 U.S.C. § 2255, was filed electronically with the Clerk of Court using the CM/ECF system.   Notice of this filing will be sent to the *pro se* defendant by placing a copy of same in the United States Mail as follows:

> Mr. Maurice Antuan Speights
> #23322-017
> FCI – Coleman Low
> P. O. Box 1031
> Coleman, FL 33521

Lafayette, Louisiana, this the 2nd day of November, 2018.

> Respectfully submitted,
>
> DAVID C. JOSEPH
> United States Attorney
>
>
> BY:   *s/ Camille A. Domingue*
>
> CAMILLE A. DOMINGUE (#20168)
> Assistant United States Attorney
> 800 Lafayette Street, Suite 2200
> Lafayette, LA 70501
> (337) 262-6618